# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**VOESTALPINE ROTEC LLC,**          CASE NO. 3:21 CV 1716

      Plaintiff,

      v.                                        JUDGE JAMES R. KNEPP II

**SUMIRIKO OHIO, INC., et al.,**

      Defendants.                          **MEMORANDUM OPINION AND
ORDER**


## INTRODUCTION

Pending before the Court in this breach of contract case are the parties' cross-motions for summary judgment. (Docs. 39, 42). Jurisdiction is proper under 28 U.S.C. § 1332. The matter is fully briefed. *See* Docs. 43, 44, 45, 46. For the reasons discussed below, the Court denies Plaintiff's Motion; Defendants' Motion is granted in part as to Plaintiff's statute of frauds affirmative defense, but is denied as to all other claims.

## BACKGROUND

This action arises out of contracts between Plaintiff Voestalpine Rotec LLC, an Indiana limited liability company, and Defendants Sumiriko Ohio, Inc., and Sumiriko Tennessee, Inc., Delaware corporations. Defendants produce automotive components, requiring specially-manufactured tubular steel parts ("Parts") which were purchased from suppliers such as Plaintiff. (Doc. 39-1, at 7; Doc. 42-1, at 8).

The parties engaged in business transactions for the sale and purchase of Parts for years before the current issue arose. Their relationship dates back to at least 2016, evidenced by early emails. *See* Doc. 42-4. In 2017, Plaintiff signed an acknowledgment stating it "reviewed and

accept[ed] the policies and procedures as outlined in the [Defendants'] Supplier Policy Manual" ("SPM"). (Doc. 39-13, at 2) (Acknowledgment). The SPM contains an array of documents and information concerning Defendants' policies, goals, and preferences. (Doc. 42-3) (SPM).

The parties' transactions were typically initiated as follows: Defendants intermittently (and irregularly) sent Master Purchase Agreements ("MPA") setting prices, Part numbers, and payment terms; Defendants then sent three-month "rolling" forecasts, estimating quantities of each Part they might order for the following months; finally, Defendants sent purchase orders to commence the transactions. (Doc. 42-7, at 3).

The transactions appear historically consistent in procedure and substance. Each MPA was identical aside from the item number and price; each stated it incorporated certain "Conditions of Purchase."[1] (Doc. 42-6, at 2–10). Similarly, the purchase orders were nearly identical, barring item numbers and quantities requested, as well as the timing for payment. *Id.* at 12–14; *see also* Doc. 39-14. Each purchase order contained a note at the bottom stating written or emailed confirmation was required. *Id.* Plaintiff appears to have consistently manufactured and delivered Parts to Defendants by the delivery methods, quantities, and prices outlined in the purchase orders, and invoiced them pursuant to the prices listed in the relevant MPA. *See* Doc. 39-15; Doc. 39-20; Doc. 42-7, at 5–6.

After three years and hundreds of transactions with seemingly no issues, a dispute arose in late 2020. (Doc. 42-7, at 5–6). On August 27, 2020, the Mexican government implemented a

---

1. As expanded upon in the Court's discussion of the Motions, the only "Conditions of Purchase" clearly pointed to in the record is a section within the SPM titled as such. (Doc. 42-3, at 57–59). That said, many inconsistencies within the produced documents leave this Court unable to determine whether that section is what the MPAs reference. *See* Doc. 42-4 (emails indicating the existence of "Conditions of Purchase" is a separate document from the SPM); Doc. 42-3, at 9, 57 (Introduction of the SPM stating the "Conditions of Purchase" are "item [14]", but the "Conditions of Purchase" section referenced by the parties appears as heading 17).

monitoring regime requiring certain steel exporters to verify that requisite value had been added to steel products in Mexico to prove exemption from U.S. anti-dumping tariffs ("Decree"). (Doc. 39-7). Just five days after the Decree's announcement, exporters had to apply for and obtain a permit from the Mexican government to ship steel products across the border. *Id.* This posed an issue for Plaintiff's production, as Yulchon, a company in Mexico, supplied the steel used to make Parts. (Doc. 16, at 5–6).

Plaintiff's supplier notified it of the Decree on September 10, 2020, and, in turn, Plaintiff notified Defendants of the Decree and potential delays on September 16, 2020. (Doc. 39-8; Doc. 42-6, at 119, 124). The new permit requirement delayed Plaintiff's ability to obtain the steel used to make Defendants' Parts during the last four months of 2020. (Doc. 16, at 8). But the parties maintained constant contact about such delays via email and telephone. In fact, daily meetings took place for months to assist with communication during the ongoing issue. (Doc. 39-3, at 16).

Though aware of the delays Plaintiff faced, Defendants continued issuing purchase orders. *Id.* at 17. But Defendants had orders to fill and clients to please, so they also ordered some Parts from another supplier to meet demands. *Id.* at 20. These other goods came at a cost and required freight shipping; Defendants claim to have expended $483,262 to keep up with their customers' orders during this period. (Doc. 16, at 9).

Plaintiff contests its obligation to abide by dates requested in purchase orders, but both parties agree that each Part requested in purchase orders was ultimately delivered to, and accepted by, Defendants. (Doc. 39-1, at 18; Doc. 42-1, at 7). On April 9, 2021, Plaintiff emailed Defendants regarding unpaid balances on the account; Defendants responded that same day indicating "most [were] paid and some [were] ready to be paid." (Doc. 39-10, at 5–6). Plaintiff's follow-up messages went unanswered until April 27, 2021, when Defendants responded with questions about

tariff refunds and expedite reimbursements. *Id.* at 2. Plaintiff responded, and the next day Defendants sent a demand-letter style document alleging breach of contract. (Doc. 39-11).

Plaintiff's Complaint for breach of contract alleges that, while there are written documents covering the subject matter, the only "contract" formed was by virtue of the shipment and delivery of goods. (Doc. 1). Plaintiff asserts Defendants breached this contract when they refused to pay for goods delivered. *Id.* Defendants' Counterclaim for breach of contract argues that a conglomeration of written documents formed an overarching "supply agreement," binding Plaintiff to every term of multiple documents. (Doc. 16). Defendants claim that Plaintiff breached this agreement by failing to reimburse them for expenses incurred by the delays. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court may not weigh the evidence or determine the truth of any matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving

4

party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting a court "need consider only the cited materials").

When parties do not dispute the facts, but dispute whether the facts give rise to a legal contract, "whether a contract exists is a mixed question of law and fact." *MTD Products Inc. v. Am. Honda Motor Co.*, 744 F. Supp. 3d 812, 819–20 (N.D. Ohio 2024) (quoting *Storm v. Bureau of Prisons*, 2009 WL 1163123, at *6 (N.D. Ohio)). Here, they dispute both.

Both parties move for summary judgment on their own claims and the claims against them. Thus, each bears the burden of persuasion, showing entitlement to a judgment on both claims.

## DISCUSSION

Both parties assert a claim for breach of contract against the other; the Motions ask for a finding for the drafter on their claim and that of the opposing party. (Docs. 39-1 & 42-1). The ethos of these Motions are alleged contracts composed of vastly different terms and intentions; they do not agree as to when the contract was formed, how it was formed, or what it required. *See id.*

Neither party truly directs this Court to the specific evidence of their claims, nor do they even argue essential specifics of the contracts. Plaintiff does not cite or support what they claim the offer, acceptance, or terms of the agreement to be. Defendants do not provide the specific purchase orders they claim are the basis of the obligations Plaintiff allegedly breached.[2]

To add to the lack of clarity, the Court notes the factual and legal complexity of this case. Attached to the parties' briefings are 3,772 pages of declarations, depositions, and exhibits.

---

2. Defendants provide what appears to be multiple versions of a spreadsheet containing, seemingly, every transaction between the parties for the entirety of their relationship. *See* Doc. 42-10, at 5–787, 790–1083. These spreadsheets span hundreds of pages, and Defendants do not direct the Court to any specific pages or transactions (which do not appear to be in any clear order) within them in support of their claims.

5

Citations in the Motions consistently point to document names and page numbers inconsistent with the Court's filing system and Local Rules; they also often reference other, nested, confusingly cited exhibits. These hurdles not only inhibit the Court's fact-finding abilities, but burden both parties' ability to fully and thoughtfully respond to the Motions.

As discussed below, the Court finds neither party has proven their preferred version of the contract under the summary judgment standard.

<u>Relevant Law</u>

Because jurisdiction arises under 28 U.S.C. § 1332, the Court looks to the forum state's choice of law rules. "Under Ohio law, the party seeking the application of the law of another state must show, at the outset, the existence of a genuine conflict between Ohio law and the law of the foreign jurisdiction." *Lorad, LLC v. Azteca Milling L.P.*, 670 F. Supp. 3d 470, 486 (N.D. Ohio 2023) (quoting *Sirlouis v. Four Winds Int'l Corp.*, 2012 WL 1068709, at *4 (N.D. Ohio)). The parties present no dispute over which law applies, and it appears facially reasonable to apply Ohio law. (Doc. 39-1, at 11). Accordingly, Ohio's version of the Uniform Commercial Code ("UCC"), found in Revised Code Chapters 1301 and 1302, applies to this case. *See Tubelite Co. v. Original Sign Studio, Inc.*, 176 Ohio App. 3d 241, ¶ 12 (Ohio Ct. App. 2008).

Under Ohio law, a successful breach of contract claimant must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Alshaibani v. Litton Loan Servicing, LP*, 528 F. App'x 462, 464 (6th Cir. 2013) (quoting *Doner v. Snapp*, 98 Ohio App. 3d 597, 600 (Ohio Ct. App. 1994)). "The essential elements of a contract include: an offer, acceptance, the manifestation of mutual assent, and consideration (the bargained-for legal benefit or detriment)." *Res. Title Agency, Inc. v. Morreale Real Est. Servs., Inc*., 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004) (citing *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002)).

6

Contract interpretation is a question of law. *Maurer v. Joy Tech.*, 212 F.3d 907, 914 (6th Cir. 2000). And "[t]he intent of the parties is best determined by the plain language of the contract." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003).

A purchase order constitutes an "offer to buy goods for prompt or current shipment" and "invit[es] acceptance by any manner and by any medium reasonable in the circumstances." Ohio Rev. Code § 1302.09; *see also Am. Bronze Corp. v. Streamway Prods.*, 456 N.E.2d 1295, 1300 (Ohio Ct. App. 1982) ("Generally, the submission of a purchase order is viewed as being an offer which may then be accepted or rejected by the seller."). When a purchase order is sent between merchants, no signature or express notification of acceptance is needed to satisfy the statute of frauds if the receiving party has reason to know of its contents and fails to object within ten days of receipt. Ohio Rev. Code § 1302.04. But if the receiver rejects the offer, or expressly conditions acceptance on additional or different terms, no contract is formed. *See* Ohio Rev. Code § 1302.10(a); *McJunkin Corp. v. Mechs., Inc.*, 888 F.2d 481, 488 (6th Cir. 1989).

To determine a contract's terms, courts typically look to the written agreement between the parties, but may look at other evidence to explain or supplement the writing's terms. *See* Ohio Rev. Code § 1302.05. Such other evidence may include course of performance and dealing, trade use, and consistent additional terms, unless the writing was intended to be a complete and exclusive statement of the agreement. *Id.* While Ohio law allows a contract to be implied from the parties' conduct, an express agreement will generally prevail over an implied one. *DuBrul v. Citrosuco N. Am., Inc.*, 892 F. Supp. 2d 892, 914 (S.D. Ohio 2012) (holding, under Ohio law, there cannot be an express agreement and an implied contract for the same thing existing at the same time); *RAM Constr. Servs. v. Key Constr., Inc.*, 624 F. Supp. 3d 884, 896–97 (N.D. Ohio 2022) (holding quasi-contract theories of recovery unavailable where parties have a written agreement that covers the

7

claims at issue); *Firestone Lab. & Manuf. LLC v. Bristow*, 745 F. Supp. 3d 552, 568 (N.D. Ohio 2024) (holding that, while claims may be plead in the alternative, an enforceable contract is legally inconsistent with a quasi-contract).

If performance of a certain term in the contract is essential to the agreement, then breach of that term can discharge the obligations of the non-breaching party. *Abercrombie & Fitch Co. v. Fed. Ins.*, 2011 WL 1237611, at *7 (S.D. Ohio) (citing *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App. 3d 163, 170 (1990)). "Generally, if time is of the essence in a contract, a delay in performance beyond the specified time will constitute a material breach." *Morton Bldgs., Inc. v. Correct Custom Drywall, Inc.*, 2007-Ohio-2788, ¶ 30 (Ohio Ct. App.).

Plaintiff claims Defendants breached a contract for the sale of Parts created by Plaintiff's delivery and Defendants acceptance of said Parts. *See* Doc. 1; Doc. 39-1. Defendants claim Plaintiff breached a contract consisting of the SPM, MPAs, and purchase orders. *See* Doc. 16; Doc. 42-1. Neither party point this Court to the (at least initial) offers of these transactions: the specific purchase orders Plaintiff's invoices cite and Defendants claim were delayed.[3] As discussed below, without these purchase orders or any evidence of their specifics, this Court cannot determine the contract's terms or Plaintiff's acceptance thereof. A reasonable jury could find a multitude of conflicting terms given the few uncontested facts presented.

Plaintiff's Motion for Summary Judgment

Plaintiff's Motion for Summary Judgment outlines the issues to be decided as follows: (1) whether Plaintiff was bound to the SPM, and if that allowed Defendant to, among other things, set delivery dates without Plaintiff's agreement; (2) whether the purchase orders had to be confirmed

---

3. Plaintiff produces nearly two-hundred invoices, but only two purchase orders. (Doc. 39-14, at 2–3). Defendants produce just three purchase orders. (Doc. 42-6, at 12, 14; Doc. 42-10, at 4).

in writing to form a contract; (3) whether Defendants can recover costs for the allegedly late deliveries after accepting all shipments; (4) whether judgment should be entered for the cost of the delivered Parts; and (5) prejudgment interest. (Doc. 39-1, at 5).

Plaintiff's overarching contention appears to be that, because the SPM is not a contract, the purchase orders were not properly "accepted," and Parts were shipped (and accepted by Defendants) after the requested dates, a contract was formed that entitles Plaintiff to the price of the Parts separate from any previously written terms or obligations. Plaintiff is correct that the delivery and acceptance of goods is conduct sufficient to recognize a contract. Ohio Rev. Code § 1302.07(A). But, here, Defendants have submitted adequate evidence to show a genuine dispute of fact as to whether a written agreement governed the transactions in question, and Plaintiff's counter-evidence does not undisputedly show it rejected such an agreement. The record also contains emails discussing some (inferably relevant, to a trier of fact) purchase orders that, at the very least, confirm their receipt and existence. (Doc. 42-6, at 171–73). There is clearly a question of fact sufficient to deny Plaintiff's contention of an exclusively implied-in-fact contract.

For clarity and ease of organization, the Court addresses Plaintiff's arguments in the order presented.

*The SPM*

Plaintiff's argument section begins with nearly five pages discussing why the SPM was not a binding agreement. (Doc. 39-1, at 11–15). Plaintiff is correct that the SPM alone is not an enforceable contract; it contains no price term, no quantity term, and no obligation imposed on Defendants. (Doc. 42-3); *see Tubelite Co. v. Original Sign Studio, Inc.*, 891 N.E.2d 820, 825 (Ohio Ct. App. 2008) (holding quantity term required for enforceable contract for sale of goods); *see also H&M Landscaping Co. v. Abraxus Salt, LLC*, 2010 WL 3441935, at *3 (Ohio Ct. App.). But

Defendants do not argue the SPM is a stand-alone binding agreement. Rather, as noted by Defendants, the issue is whether certain terms of the SPM, or some other "Conditions of Purchase," were binding through a larger agreement or purchase orders. (Doc. 43, at 14).

Plaintiff further argues that, even if the purchase orders' terms controlled the agreement, the SPM is not integrated into any purchase order. (Doc. 39-1, at 14). But a document that independently lacks binding, contractual obligations may be incorporated into subsequent, contractually-binding agreements. "To incorporate a document, [a] contract 'must explicitly, or at least precisely, identify the written material [being] incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract.'" *Selective Way Ins. v. Glasstech, Inc*., 2018 WL 1871092, at *2 (N.D. Ohio) (quoting *Volovetz v. Tremco Barrier Sols.*, 74 N.E.3d 743, 751–52 (Ohio Ct. App. 2016)). Negotiations and promises made prior to a formal agreement are generally excluded from consideration. *See Busler v. D & H Mfg., Inc.*, 81 Ohio App. 3d 385, 390 (Ohio Ct. App. 1992).

Plaintiff submitted sample purchase orders. (Doc. 39-14). Not only do the face of those purchase orders show the Part numbers from the MPAs, but Plaintiff's submitted invoices also directly reference the MPAs. *See* Doc. 42-6, at 2–10; Doc. 39-15. And the shipment of goods under a purchase order in compliance with an over-arching purchase order (such as an MPA) creates acquiescence to it. *See, e.g., Kidron, Inc. v. Simon-Duplex, Inc.*, 2000 Ohio App. LEXIS 4165, at *10–11 (Ohio Ct. App.) ("The blanket purchase order clearly evidences some agreement between the parties. The fact that the agreement stated that a separate purchase order would be issued for each [purchase] does not render the agreement invalid."). The MPAs were integrated into the later purchase orders.

10

The MPAs explicitly state:

> SUPPLIER AGREES THAT ITS SALE OF ITEMS OF SERVICE TO [DEFENDANTS] . . . [ARE] MADE **SUBJECT TO THE APPLICABLE SRK CONDITIONS OF PURCHASE (AND ALL DOCUMENTS INCORPORATED IN THOSE CONDITIONS OF PURCHASE) ALL OF WHICH ARE INCORPORATED BY REFERENCE AS PART OF THE PURCHASE ORDER.** THE CONDITIONS OF PURCHASE ARE EITHER CONTAINED IN A SEPARATE DOCUMENT ENTITLED [sic] "CONDITIONS OF PURCHASE" SIGNED BY THE SUPPLIER AND [DEFENDANTS] OR HAVE BEEN PROVIDED TO THE SUPPLIER IN A SEPARATE COMMUNICATION FROM SRK.

(Doc. 42-6, at 2–10) (emphasis added). The MPA expressly incorporates the Conditions of Purchase and documents within it. If Plaintiff accepted the relevant purchase orders, those transactions may be subject to the MPA, the Conditions of Purchase, and all documents referenced within the Conditions of Purchase. *See MTD Prods. Inc.*, 744 F. Supp. 3d at 826 ("Under this type of arrangement, [while] the parties are bound by only the firm releases that specify quantity, . . . those releases are subject to the terms and conditions of the umbrella agreement.").

Plaintiff's attempt to contort the applicability of other conditions to the purchase orders by pointing to provisions in the SPM is unavailing. (Doc. 39-1, at 14–15). But such arguments highlight a notable issue—while clear that "Conditions of Purchase" and referenced documents are the only things integrated, it is unclear exactly what those are. The only "Conditions of Purchase" submitted to the Court is a section within the SPM, but its location differs from all references to the "Conditions of Purchase" within the evidence the parties cite. For example, the SPM indicates "SRK's Standard Conditions of Purchase" were "included in [the] manual [as item fourteen,]" but no such "item" appears in the SPM of record; the only "Conditions of Purchase" in the SPM provided is section seventeen. (Doc. 42-3, at 7, 57–59). Plaintiffs note another reference to "Conditions of Purchase" as being "stated on the [p]urchase [o]rders" (Doc. 39-1, at 14; Doc. 42-3, at 9), and emails submitted by Defendants state that the SPM and Conditions of Purchase are

11

two separate things (Doc. 42-4). Neither party parses out this issue, but it is not necessary to or determinative of the outcome of either Motion.

Summary judgment on this basis is inappropriate. A reasonable jury could find the purchase orders are subject to Conditions of Purchase that would allow Defendants to recover.

*Acceptance of Individual Purchase Orders*

Plaintiff next contends Defendants do not claim that any specific purchase order is binding on it, but goes on to argue that even if they did, Plaintiff never accepted any per the required method of acceptance. (Doc. 39-1, at 15).

While correct that Defendants have not pointed to the exact purchase orders they claim have been breached, they have consistently argued the purchase orders were binding. *See, e.g.*, Doc. 42-1, at 7; Doc. 43, at 7. The fact that Defendants argue other documents, by reference or custom, were also a part of the agreement does not invalidate their claim. And Defendants produced evidence suggesting Plaintiff may have violated delivery dates potentially mandated by purchase orders. (Doc. 43-1, at 9–12).

As to the method of acceptance, the Court finds there was no exclusive method of acceptance required on the purchase orders. Each purchase order included the statement: "Email/Written Confirmation of Purchase Order is Required." *See, e.g.*, Doc. 39-14. Plaintiff claims this makes explicit, written acceptance of each purchase order a prerequisite for contract formation here; because Plaintiff did not comply with this "method of acceptance," it argues to have not accepted any of Defendants' offers/the purchase orders. (Doc. 39-1, at 15–17). But "[o]rdinary words in a written contract must be 'given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.'" *Quest Workforce Sols., L.L.C. v. Job1USA, Inc.*, 75 N.E.3d 1020,

1031 (Ohio Ct. App. 2016) (*quoting Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 148 (Ohio 1978)).

"Confirmation," while similar, is different from "acceptance." As Defendants point out, Plaintiff's argument hinges on cases that expressly required "acceptance" in a certain way. (Doc. 39-1, at 16–17). Such is not the case here. (Doc. 43, at 20–21). The purchase orders did not use the word "acceptance," and Defendants show Plaintiff provided email *confirmation* of receiving at least some purchase orders. (Doc. 43-1, at 14–16).

This is not to be confused with a finding that Plaintiff did, in fact, accept the purchase orders. Defendants have not pointed to evidence proving Plaintiff's acceptance of the purchase orders in question. The Court's holding here is that the plain language, which requires "confirmation of purchase orders," is to be given its ordinary meaning. The ordinary meaning of "confirmation" is just that: "an act or process of confirming[.]" Merriam-Webster, "confirmation," https://www.merriam-webster.com/dictionary/confirmation. The purchase orders did not require "acceptance" in an exclusive way by any explicit terms. Plaintiff's acceptance or denial of such orders, however, is a disputed issue of fact. Summary judgment on this basis is denied.

*Defendants' Ability to Recover for Accepted Goods*

Plaintiff next argues Defendants have no right to recover for costs incurred in purchasing substitute goods because they accepted delivery of the Parts. (Doc. 39-1, at 17). Plaintiff relies on UCC § 2-711 and Ohio Revised Code § 1302.85 to contend the acceptance of delayed goods bars any ability to claim costs of "cover" that the buyer may have incurred. *Id.* It also cites Official Comment No. 1 to UCC § 2-711, which states the remedies listed, including cover, "are those available to a buyer who has not accepted the delivery of the goods." *Id.* at 17–18. But this argument is one for a positive to equal a negative; Plaintiff is contending that because substitute

13

goods are a remedy available where acceptance is refused, that is *only* appropriate in that circumstance. *Id.* Not so. The Comment which Plaintiff submits states that the "remedies available to a buyer with regard[] to goods finally accepted appear in the section dealing with breach in regard to accepted goods." *See* Doc. 39-21, at 2; Official Comment No. 1 to Ohio Rev. Code § 1302.85.

Defendants note "basic principles of contract law" contradict Plaintiff's argument here. (Doc. 43, at 22). They are correct. Under Ohio Revised Code § 1302.88, the section dealing with breach in regard to accepted goods, "[w]here [a] buyer has accepted goods and given notification . . . he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined *in any manner which is reasonable*." Ohio law does not align with Plaintiff's assertions here.

As discussed, a reasonable jury could find that Plaintiff accepted individual purchase orders by looking at communications and historical practices of the parties. Seeing the urgency Defendants conveyed but having no clear evidence (directly identified) regarding how many parts were late or how late any were, such a jury might reasonably see purchasing parts to send to their customers as damages stemming from Plaintiff's breach. There are far too many issues of fact to find for Plaintiff on this issue.

*Judgment on Delivered Goods and Prejudgment Interest*

There is no dispute that Defendants did not pay Plaintiff for Parts delivered and accepted; the contested issue is whether they were required to. A buyer must pay for goods accepted. *Harris Thomas Indus., Inc. v. ZF Lemforder Corp.*, 2007 WL 3071676, at *4 (S.D. Ohio). But parties are free to contract around obligations otherwise existing in contract law. Ohio Rev. Code § 1302.93. There is a disputed issue of fact as to whether such a contract is at play here.

Plaintiff has not proven that the alleged purchase orders do not govern the transactions in question. Plaintiff submitted 165 invoices, allegedly totaling $283,778, and emails showing Defendants' acknowledgment of such. (Doc. 39-15, at 2–166; Doc. 39-1, at 19–20; Doc. 39-11). While Defendants submitted evidence showing the parties discussed reimbursements, they also submitted emails appearing to show an understanding that a *third party* would be held accountable for reimbursements. (Doc. 43-1, at 227, 229). Plaintiff has not satisfied its burden of showing the parties' contract did not include terms which would allow Defendants to "withhold, offset, or recoup its expedited shipping fees or other costs, or be released from liability for future payments[.]" (Doc. 43, at 23). Because a jury could reasonably find Conditions of Purchase applied to the parties' agreements, which would allow Defendants to withhold the amount in question, summary judgment is inappropriate on this basis.

Also in this section of its Motion, Plaintiff claims delivery dates would be irrelevant to any allegedly-applicable purchase order because of the "previous dispositive course of dealing evidence." (Doc. 39-1, at 20–21). Plaintiff includes a small chart in its Motion and attaches a larger one as an exhibit, attempting to show that over fifty percent of the deliveries between the parties had been late during the duration of their relationship. *Id.*; Doc. 39-20. But Defendants also submitted a chart. (Doc. 43-2, at 161–942, 946–1241). Defendants' chart added some, though not entirely digestible, context to Plaintiff's claim, showing the "late" deliveries in the past may have been nowhere near the length of the delays presently at issue. *Id.* And, regardless, Defendants made clear the urgent nature of the relevant deliveries, and both parties submitted evidence showing such. (Doc. 43-1, at 197, 199, 201). Again, as Defendants note in opposition, the parties' conduct on the record exemplifies an understanding of how important timing was. *Id.* at 197–200.

Plaintiff's final contention in this section is that "delivery could not have constituted an acceptance of a purchase order" because "the delivery due date had already passed by the time of delivery, making it logically impossible to form a contract that included a delivery deadline before the contract was formed." (Doc. 39-1, at 22). In support of this contention, Plaintiff cites an overruled Ninth Circuit case applying a California statute to purchase orders that contained no delivery dates. *Id.*; *see Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983). Defendants correctly suggest this case law is unsupportive. (Doc. 43, at 25).

Numerous factual issues exist on this issue. For example, both parties have competing recitations of the transactional history, discussions during the timeframe at issue, and the understandings at the time the relevant purchase orders were being submitted. *See* Doc. 39-1, at 6–10; Doc. 43, at 7–13. A jury could reasonably find for either party given the conflicting evidence and the parties' competing interpretations thereof.

For the reasons stated above, the Court denies Plaintiff's Motion as to both claims.

<u>Defendants' Motion for Summary Judgment</u>

Defendants' Motion for Summary Judgment frames the issues as: (1) whether the SPM, MPA, and purchase orders together formed a binding agreement which Plaintiff breached without legal excuse; (2) whether Defendants were obligated to pay Plaintiff for the delivered goods or are entitled to recover costs associated with the delay; (3) whether Defendants are entitled to prejudgment interest; and (4) whether Defendants are entitled to attorneys' fees. (Doc. 42-1, at 5–6). As with Plaintiff's Motion, the Court discusses Defendants' arguments in the order presented.

For Defendants to succeed on summary judgment as to its breach of contract claim, they must show: (1) Plaintiff accepted the allegedly breached purchase orders; and (2) Defendants were entitled to offset money owed to Plaintiff because either (a) the contract terms included the portion

of the SPM that allowed such or (b) they were entitled to "cover" or comparable damages under Ohio law. Because Defendants do not point to sufficient undisputed evidence, and the record as a whole does not show a reasonable jury could not find for Plaintiff, Defendants' Motion fails.

*Overarching Agreement*

Defendants' first argument is that all elements on their breach of contract counterclaim are met, and that they have proven: (1) a valid, enforceable contract containing the SPM; (2) fulfillment of their obligations; and (3) Plaintiff's breach and resulting damages. As discussed, the crux of this dispute is what terms comprised the contract. Defendants fail to prove those terms at this stage.

To begin, Defendants appear to implicitly argue that there was a requirements contract. (Doc. 42-1, at 15). This contention is unsupported by the record. "The UCC allows parties to a contract, rather than specifying a quantity, to measure the quantity of goods by the good-faith output of the seller or the good-faith requirements of the buyer." *H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 41 N.E.3d 915, 923–24 (Ohio Ct. App. 2015). But this requires some proof that the parties made such an agreement. That simply did not happen here. Defendants do not direct the Court to evidence showing express agreement between the parties to buy from or supply the other exclusively or entirely. *See Sundram Fasteners, Ltd. v. Flexitech, Inc.*, 2009 WL 3763772, at *8 (E.D. Mich.) (because the contract was not a requirements contract, blanket purchase order "did not commit [the buyer] to purchase, or [the seller] to sell any specific quantity of [parts]", and "[t]he obligation to manufacture or ship parts arose only after [the seller] had received a release from [the buyer]"); *see also Revere Plastic Sys., LLC v. Plastic Plate, LLC*, 509 F. Supp. 3d 986, 1000 (N.D. Ohio 2020) ("Forecasts are nothing more than forecasts, and do not create a legal obligation to purchase") (quoting *Sundram Fasteners Ltd.*, 2009 WL 3763772, at *10).

17

As discussed, the Sixth Circuit has held that where a "blanket purchase order" is made between the parties, and later releases or purchase orders "govern supply and delivery, the only contracts are the releases that have been accepted between the parties." *Harris Thomas Indus., Inc.*, 2007 WL 3071676, at *5 (citing *Advanced Plastics Corp. v. White Consolidated Indus., Inc.*, 1995 U.S. App. LEXIS 1047 (6th Cir.)); *see also Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 7 F. Supp. 2d 954, 960 (N.D. Ohio 1998) (holding parties had separate contracts for each shipment of product).

### Valid, Enforceable Contract

It is clear that a contract existed, and that there was mutual assent to many of its terms—because of this, "the rest of the essential terms must be those that existed at the time of acceptance. The pertinent inquiry, then, is when did acceptance occur?" *Gen. Metal Heat Treating, Inc. v. Precision Gear LLC*, 2013 Ohio Misc. LEXIS 8, at *13 (Ct. Com. Pl. 2013). Defendants claim the "undisputed record" shows the purported contract included the entire SPM. (Doc. 42-1, at 15). This is no doubt disputed. *See, e.g.*, Doc. 1; Doc. 39-1; Doc. 45. Even if the transactions fall under an "overarching agreement" comprised of purchase orders and the MPAs, Defendants have not disproven the ambiguity Plaintiff argues as to the "Conditions of Purchase" so as to overcome the summary judgment standard. *See* Doc. 39-1, at 14–15; Doc. 42-4, at 9. And Defendants' contention that the parties "*always* conducted themselves in accordance with the SPM, MPAs, and [p]urchase [o]rders up to the [relevant] time period" is patently disputed and without direct support. (Doc. 42-1, at 15) (emphasis added) (citing Doc. 42-7, at ¶ 22, which describes the parties' conduct "in general"). Further, both parties' cited evidence shows at least delivery dates were constantly different than those stated on purchase orders, and Defendants point to no record of such conduct being historically contested. (Doc. 39-20) (Defendants' chart organized and totaled by Plaintiff).

Multiple shipments during the life of the parties' relationship were made by the purchase orders and MPAs. The MPAs explicitly incorporate Conditions of Purchase, meaning all purchase orders accepted under the MPA would be subject to those conditions. *See* Discussion, *supra*. That said, Defendants have not shown the deliveries in question were in response to accepted purchase orders. (Doc. 42-1, at 9).

Defendants do not point this Court to the exact purchase orders they claim Plaintiff breached, nor do they direct this Court's attention to any clear information stating exactly which Parts from which purchase orders were late or how late they were. And while Defendants claim all purchase orders were accepted and confirmed by Plaintiff, they immediately thereafter state that the status of parts were discussed "even for those [purchase orders] that Plaintiff had not provided an email or written confirmation." *Id.* at 15.

But a party need not produce explicit statements of acceptance if they can prove the acceptance of a contract and its terms otherwise. *See Richard A. Berjian, D. O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St. 2d 147, 152 (Ohio 1978) (holding it unnecessary to formally express acceptance for an enforceable contract where other circumstances justify an inference of acceptance). Defendants note that Plaintiff reimbursed them for having a third-party aid in getting a shipment out of Mexico. (Doc. 42-2, at 10). They also contend "[c]ommon sense dictates that Plaintiff would not have done any of these things if [it] had not accepted the purchase orders[.]" (Doc. 42-1, at 16). But common sense might also dictate that Plaintiff would not have accepted purchase orders on a continuing basis knowing it could not meet required deadlines and would be exposed to legal consequences. Plaintiff notes Defendants' prior general manager of procurement could not say at his deposition whether Plaintiff agreed to purchase orders during this time or if any attempt was made by Defendants to figure out said agreement. (Doc. 39-3, at 17–18). And

19

emails show that Plaintiff may have communicated the inability to supply certain purchase orders and offered alternative dates shortly after receipt, leaving further doubt as to whether acceptance occurred in some instances. (Doc. 43-1, at 308). As discussed, the evidence to which this Court was directed does not prove a requirements contract, so Plaintiff was not required to accept any purchase orders; the evidence pointed to by Plaintiff contesting acceptance is enough to survive summary judgment on the issue of what the contract consisted of.

### Fulfillment of Obligations

Defendants state they fulfilled all obligations under the "contract," but the record still suggests a jury could reasonably find different obligations were imposed by the agreement than those stated by Defendants. While Defendants have failed to produce the exact purchase orders which they claim Plaintiff breached (or the specifications of each breach as to each purchase order), the failure to pay for goods delivered and accepted is a breach under Ohio law. *Harris Thomas Indus., Inc.*, 2007 WL 3071676, at *4. Defendants have not specifically identified evidence to prove the contract provides terms otherwise. A jury could reasonably find Defendants had to pay Plaintiff for the deliveries it accepted upon receipt, and failed to fulfill such obligation.

### Plaintiff's Breach and Resulting Damages

This Court acknowledges that if Defendants could prove Plaintiff accepted a contract that binds it to what they claim, Plaintiff's breach could easily be shown. (Doc. 42-1, at 16–17). But not only do Defendants not meet their burden of showing the contract's impositions, they also fail to point the Court to adequate evidence of causation. As Plaintiff notes in opposition, Defendants cite two spreadsheets to demonstrate damages,[4] and neither of them shows what costs were

---

4. In its Opposition, Plaintiff argues one of the documents should be precluded from consideration based on a production failure. (Doc. 45, at 9–11). But Plaintiff further argues the evidence does

incurred in relation to what Parts Defendants claim were delayed based on any particular purchase order. Plaintiff accurately notes, "[e]ntirely missing from any of the voluminous submissions from [Defendants] is any identification of what late shipment caused what damages." (Doc. 45, at 11).

Defendants claim they have shown that the amounts alleged in the damages spreadsheet were "directly caused by the wrongful breach," but their cited support consists of conclusory statements by their own employees and spreadsheets that lack clarity or specificity. *See* Doc. 42-1, at 16–17 (citing to a portion of Jeffrey Campbell's declaration which states costs incurred were "due to Plaintiff's breaches"). Further, with no context provided to the Court, emails in the record seemingly question whether Defendants were obtaining more Parts than originally requested of Plaintiff. *See, e.g.*, Doc. 43-1, at 329–32. The spreadsheet itemizing alleged damages does not specify whether certain costs were the result of any delayed purchase order, and the spreadsheet containing invoice information does not point this Court to any clear indication of such. *See* Doc. 42-6, at 204; Doc. 42-10, at 5–714.

Regardless, Defendants failed to prove that Plaintiff had an obligation to abide by certain dates contained in purchase orders. As such, they have not demonstrated a breach by Plaintiff which would entitled them to summary judgment on this issue.

### Plaintiff's Affirmative Defenses

Finally, this section of Defendants' Motion argues for judgment in their favor on Plaintiff's affirmative defenses. Plaintiff pled the affirmative defenses of commercial impracticability, failure to mitigate, and statute of frauds.

---

not matter anyway. And as Defendants note in Reply, it had been previously produced. The Court will consider this evidence.

The duty to deliver under a contract can be discharged if performance becomes impracticable. Ohio Rev. Code § 1302.73. A party asserting regulatory impracticability must show: "(1) that a supervening regulatory action has occurred, (2) that the action was unforeseeable so as to undermine a basic assumption of the bargain, taking into account the parties' assumption of risk and the realities of industry practice, (3) that the action rendered performance impossible or impracticable under the relevant legal standard, and (4) that the party claiming excuse attempted in good faith to comply with or avoid the application of the relevant regulation." *Mt. Pleasant Blacktopping Co. v. Inverness Grp., Inc.*, 2025-Ohio-284, ¶ 61 (Ohio Ct. App.).

Defendants argue that because the agreement between the parties did not specify Plaintiff must obtain steel from Mexico, Plaintiff was not the company directly required to apply for a permit, and there was a preexisting export/import requirement, the Decree did not create an inability to perform under the contract. (Doc. 42-1, at 18). As Plaintiff correctly notes, the material being from a Mexican supplier need not be a basic assumption of the agreement in a case such as this, where a government regulation is alleged to have created the impracticability. *See* UCC 2-615. Further, Plaintiff's direct compliance, versus their supplier's compliance, with the regulation is not a determining factor under this inquiry, and there is no actual dispute that the relevant regulation went into place at the time it did. *Id.*; Doc. 39-1. Defendants' speculation about Plaintiff's supplier's "inconsistencies" with documentation is unsupported.[5] And multiple emails

---

5. Defendants cite to the declaration and report of Juan Carlos Partida to support the contention that Plaintiff's supplier would have been able to obtain permits if it had complied with the Decree in good faith. (Doc. 42-1, at 19–20). But such citations point only to conclusory statements, not supported facts. *See, e.g.*, Doc. 42-1, at 19 (Defendants' Motion for Summary Judgment citing to the Partida Declaration, Doc. 42-11, at ¶ 22, to claim that if Plaintiff's supplier had been complying with export requirements, it "would have been able to obtain permits from the Mexican government without issue"); *then see* Doc. 42-11, at ¶ 22 (concluding, without providing support, that if the supplier "had been complying with the requirements" before the Decree, it "would have been able to obtain the permits").

support Plaintiff's efforts to comply with the Decree to get the materials across the border. *See, e.g.*, Doc. 45-7.

Defendants' final argument on impracticability is that Plaintiff could have found an alternative way to supply Parts to Defendants. (Doc. 42-1, at 14–15). Plaintiff offered emails discussing the steps it took to remedy the situation in support of its contention that it "exhausted all other options at the time and explained why it was not possible to do anything more." (Doc. 45, at 17; Doc. 45-6). Defendants contend Plaintiff's email is not enough and note other ways Plaintiff could have performed without delay. (Doc. 46, at 13). But Plaintiff points to contrary evidence in the record to show an issue of fact more suitable for a jury.

As to Plaintiff's failure to mitigate defense, the Court need not address Defendants' arguments. Defendants have not directed attention to evidence that would show a clear relationship between the specific alleged breaches and the costs incurred, negating Plaintiff's ability to respond in support of its affirmative defense at this stage.

As to Plaintiff's statute of frauds affirmative defense, it correctly conceded that it is "not applicable" to the circumstances at hand. (Doc. 45, at 17). As a result, this Court finds summary judgment is appropriate for Defendants on this defense alone.

*Recovery for Delay Expense*

Defendants next argue summary judgment should be granted on Plaintiff's claim because either (1) it failed to prove breach of contract or (2) Defendants' affirmative defenses succeed. As to the first issue, this Court discussed *supra* that neither party has proven its version of the contract's terms under the summary judgment standard. Defendants' argument fails for the same reasons set forth above; there is too much left to the imagination where a jury could reasonably infer for the opposing party. As to the second issue, Defendants have asserted affirmative defenses

of prior material breach, set-off/recoupment, and failure to mitigate; all fail at the summary judgment stage for the reasons discussed below.

### Defendants' Affirmative Defenses

"[A]n affirmative defense is a 'perhaps, but' defense, which allows a party to argue that it is not liable even if the plaintiff has proved a prima facie case." *Acquisition & Rsch. LLC v. Filion*, 2023 WL 6929738, at *3 (S.D. Ohio) (quoting *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 775 (S.D. Ohio 2021)). The issue is whether genuine disputes exist of any material facts underlying the various affirmative defenses Defendants assert. *Id.* Because, as discussed above, there is genuine dispute of fact as to whether Plaintiff was required to deliver by certain dates listed on purchase orders, Defendants have not successfully proven any of their affirmative defenses at this stage.

As to prior material breach, Defendants' argument is unresponsive to Plaintiff's claim. Defendants argue that, based on the prior material breach of *their* version of the purported contract, not Plaintiff's, Plaintiff breached first by failing to deliver on time. (Doc. 42-1, at 17–20). But Plaintiff's breach of contract claim asserts that the delivery date set forth by Defendants is not binding; it is illogical to ask the Court to find for this affirmative defense based on a competing version of events. *Id.* at 17. Further, this is an element to Defendants' own breach of contract claim, which this Court has already determined material questions of fact prevent a finding at this stage. So summary judgment is denied on this affirmative defense, as this alleged delivery date is a matter for Defendants to prove at trial.

Recoupment is an affirmative defense which can permit a defendant to reduce a plaintiff's claim to the extent that the defendant has been wronged; it arises out of the same transaction which the plaintiff claims. *In re Reeves*, 265 B.R. 766, 769–70 (Bankr. N.D. Ohio 2001) (citing *Univ.*

*Med. Ctr. v. Sullivan*, 973 F.2d 1065 (3rd Cir. 1992)). This means Defendants must prove Plaintiff "wronged" them and caused damage from the contract as described in Plaintiff's claim. *In re Reeves*, 265 B.R. at 770 (citing *United States Abatement Corp. v. Mobil Expl. & Prod. U.S., Inc.*, 79 F.3d 393, 398 (5th Cir. 1996)). Defendants have claimed $483,262 in damages from the delays, but Plaintiff has rightfully contested the support and specificity to prove causation. (Doc. 42-6, at 204; Doc. 45, at 9–12). But, as stated, there is a genuine dispute as to Plaintiff's duty to deliver the Parts by a certain date; Plaintiff was consistently communicative and open about the fact that delays were ongoing while Defendants continued submitting purchase orders. And Plaintiff directly disputes acceptance, which a jury could reasonably find when considering the express indications of ongoing delays at the same time purchase orders were coming in. Defendants cannot succeed on this affirmative defense at this stage because they have not shown "wrongdoing" by Plaintiff based on facts that would have caused the alleged harm.

Setoff is an affirmative defense which "permits a party to reduce mutual claims that arise out of a transaction extrinsic to the plaintiff's cause of action." *In re Reeves*, 265 B.R. at 770 (citing *In re Jones*, 122 B.R. 246, 249 fn. 2 (W.D.Pa. 1990)). Once again, this affirmative defense fails in the current posture because it requires Defendants to prove their breach of contract claim, which they have failed to do at the summary judgment stage.

The affirmative defense of failure to mitigate, again, would require a finding for Defendants that Plaintiff was contractually obligated to abide by a specific date, which has not been established because Defendants failed to provide the evidence to support it at the summary judgment stage.

Thus, the Court denies Defendants' Motion as to its affirmative defenses.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 39) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 42), be and the same hereby is, GRANTED in part as to Plaintiff's statute of frauds affirmative defense, but DENIED as to all other claims.


 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: March 28, 2025